UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CRAIG RIXNER                                    CIVIL ACTION

VERSUS                                          NO.  11-2090

DR. DENNIS LARAVIA                              UNITED STATES MAGISTRATE
                                                JUDGE KAREN WELLS ROBY

ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment (Rec. Doc. No. 23)** filed by the

defendant, Dennis Laravia, M.D. ("Dr. Laravia"), which was submitted without oral argument on

April 25, 2012.[1]  Dr. Laravia seeks dismissal of Plaintiff Craig Rixner's ("Rixner") claims against

him as a matter of law, or alternatively because he is entitled to qualified immunity, or because the

claims are frivolous.  Rixner has filed an untimely opposition to the motion.[2]

I.      **Factual Background**

        A.      **The Complaint**

        On August 31, 2011, Rixner filed this *pro se* and *in forma pauperis* civil rights complaint

pursuant to 42 U.S.C. § 1983 against Dr. Laravia for denial of adequate medical care while he was

housed in the B.B. "Sixty" Rayburn Correctional Center ("RCC").  He is presently incarcerated in

the David Wade Correctional Center ("DWCC") in Homer, Louisiana.  Rixner alleges that he was

---

[1]The Magistrate Judge is acting upon consent of the parties under 28 U.S.C. § 636(c).  Rec. Doc. No. 16.

[2]Rec. Doc. No. 26.

transferred from Elayn Hunt Correctional Center ("EHCC") to RCC on May 5, 2011.  His prescribed medication list was sent to RCC with him.  He alleges that he received his medication until May 10, 2011, when he was first examined by Dr. Laravia.  Rixner claims that Dr. Laravia discontinued the medication without a physical examination and without providing him with reasons for his decision.

Rixner further alleges that he filed an administrative grievance complaint about the doctor's decision.  He claims that the medication had been a vital part of his treatment for HIV.  He indicates that he was taking Lopid,[3] a statin essential for lowering his triglycerides which are elevated due to the side effects of his anti-retroviral treatment for HIV.  Dr. Laravia told him that he would wait for laboratory results before he would prescribe a lipid agent.  Rixner claims that his lab results were returned on May 25, 2011, showing that his triglycerides were high.  Dr. Laravia did not see him or order a lipid agent medication.

Rixner also alleges that, on June 30, 2011, he was seen by Dr. Walter Campbell ("Dr. Campbell") at the infectious disease clinic.  She told him that his triglycerides were too high and that this made him susceptible to heart disease and stroke.  Rixner claims that she ordered a lipid agent, but no one at the prison provided it to him.

Rixner further claims that he filed three sick call requests at RCC about his health problems and pain.  Each time, he was ordered Tylenol, Keppra,[4] Ibuprofen, Norvasc[5] for high blood pressure,

---

[3]Rixner erroneously referred to this medication as "Lopin," which is not a recognized medication in the United States.  Lopid is a brand name for gemfibrozil, uses to treat hypercholesterolemia, hyperlipidemia, and hypertriglyceridemia.  *Physicians' Desk Reference*, p. 122 (66th ed. 2012) ("*PDR*").  This is a medication that was prescribed to Rixner at EHCC.

[4]Keppra is the brand name for levetiracetam, an anti-seizure medication that was prescribed for Rixner at EHCC.  Rec. Doc. No. 23-3, Medical Record Transfer Summary (2 pages), p.2, 5/5/11; *PDR*, p. 123.

[5]Norvasc is a brand name for amlodipine besylate used to reduce the risk of angina, revascularization, coronary artery disease, and hypertension.  *PDR*, at p. 117.

2

Pepto Bismol, or some other medicine that he is not able to take.  He explains, for example, that Tylenol is not recommended because of his liver disease, Hepatitis C.  He wrote complaints to the Director of Nursing, Bessie Carter, and she told him to make sick call for an evaluation of the need for him to see a doctor.

He also claims that he reported to sick call on August 8, 2011, due to severe nausea and diarrhea as a result of the HIV medication.  He was given Pepto Bismol and told to return to sick call.  He complains that this is an on-going problem due to the discontinuation of his prescription for Phenergan.[6]

Rixner alleges that Dr. Laravia should be held liable for his pain and suffering and his mental and emotional stress suffered as a result of the intentional indifference to his medical needs.  He urges that Dr. Laravia was aware of the dangers and risks to his health if he is not properly treated.  He claims that his disregard for his serious medical needs demonstrates gross negligence, deliberate indifference, and medical malpractice.  He claims that he now fears for his life.  He seeks to recover damages in the amount of $100,000.00 and to be transferred back to EHCC for proper medical treatment.

### B.    The *Spears* Hearing

On October 28, 2011, the Court conducted a hearing pursuant to *Spears v. McCotter*,[7] and its progeny, with the plaintiff and counsel for the defendant participating by conference telephone

---

[6]Phenergan is a brand name for promethazine used for allergies, anaphylaxis, conjunctivitis, motion sickness, nausea, pain, rhinitis, sedation, preoperative sedation, urticaria, and vomiting.  *PDR*, p. 126.

[7]766 F.2d 179 (5th Cir. 1985).  The purpose of the *Spears* Hearing is to ascertain what it is the prisoner alleges to have occurred and the legal basis for the claims.  The information elicited at the hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  *Wilson v. Barientos*, 926 F.2d 480, 482 (5th Cir. 1991).

call.[8]   At the hearing, Rixner reiterated the claims in his complaint including the following information.   He also testified that he arrived at RCC on May 5, 2011.   He was on several medications at that time, including a statin called Lopid, Benadryl, Phenergan, and anti-retroviral medications for HIV.   He saw Dr. Laravia on May 10, 2011, and his statin medication was discontinued.

He recalled that on May 15 or 16, 2011, he was scheduled to see Dr. Campbell, an infectious disease specialist.   He saw her on or about May 30, 2011 and she ordered that he be placed back on a statin medication.   He did not receive that medication.   When he made sick call on July 21, 2011, he was only given Tylenol and a Celestone[9] injection.   He also stated that he suffers with peripheral neuropathy which compromises his system and is not considered in his overall treatment.

## II.   Defendant's Motion

### A.   Defendant's Argument

In the motion for summary judgment, Dr. Laravia seeks dismissal of Rixner's claims against him, because Rixner cannot establish that he was denied adequate medical care or that Dr. Laravia was intentionally indifferent to his serious medical needs.   He argues that Rixner simply disagrees with the treatment he received, which is not sufficient to succeed on an Eighth Amendment claim under § 1983.   Alternatively, Dr. Laravia also argues that his treatment was reasonable under the circumstances and that he is entitled to qualified immunity from suit.   Dr. Laravia further argues that, based on the evidence attached to the motion, Rixner's suit is frivolous, because he cannot prove an Eighth Amendment claim.

---

[8]Rec. Doc. No. 11.

[9]Brand name for betamethasone, used to treat athlete's foot and infections.  *PDR*, p. 118.

In support of the motion, Dr. Laravia has submitted his own affidavit setting forth the course of treatment he provided to Rixner and the basis for his medical decisions. He has also provided verified copies of the administrative grievance proceedings submitted by Rixner to the prison administration. In addition to a copy of Rixner's entire medical file, Dr. Laravia has also specifically included copies of the notes from Rixner's intake examination on May 5, 2011, his medication profile, the medication records received at the time of his transfer, a health care request form dated May 16, 2011, and a refusal to accept medical care form signed by Rixner on May 17, 2011.

### B. **Plaintiff's Opposition**

In his untimely filed opposition, Rixner reiterates his arguments raised in his complaint and at the *Spears* Hearing. He challenges Dr. Laravia's affidavit in support of the motion, which asserts that he thoroughly examined Rixner and found no objective reason in his records for having him on certain medication. Rixner denies that Dr. Laravia ever thoroughly examined him. He also claims that there are genuine issues of fact remaining, because he has presented his own affidavit contradicting how his medical needs were addressed and the effects of the treatment course set by Dr. Laravia. He states that his records show a serious need for him to have been placed on a statin to lower his triglycerides to avoid serious heart conditions. He further states that the pain medication he was taking for his neuropathy also decreased the pain occurring as a side effect from the HIV anti-retroviral medication. He asserts that Dr. Laravia knew or should have known of these conditions from his medical records and the medical history he provided, and that Dr. Laravia acted with disregard to the excessive risks to his health. Rixner has submitted his own affidavit setting forth the claims he urges against Dr. Laravia.

III.    **Standards of Review**

    A.    **Summary Judgment under Federal Rule of Civil Procedure 56**

Dr. Laravia has filed in the instant motion seeking summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Lindquist v. City of Pasadena, Tex.*, 669 F.3d 225, 232-33 (5th Cir. 2012) (*quoting Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried.  *See Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986); *Lindquist*, 669 F.3d at 233 (quoting *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008)).  In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party.  *Andersen*, 477 U.S. at 248; *Lindquist*, 669 F.3d at 233 (*Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 429-30 (5th Cir. 2009)).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Once the moving party carries its burden of proving that there is no material factual dispute, the burden shifts to the nonmovant to show that summary judgment should not lie.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001); *Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994). While the court must consider the evidence with all reasonable inferences in the light most favorable

to the nonmovant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

Instead, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue of fact for trial." *Celotex Corp.*, 477 U.S. at 324. If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *See Szabo v. Errisson*, 68 F.3d 940, 942 (5th Cir. 1995); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994).

### B.     Qualified Immunity

Dr. Laravia alternatively argues that the motion can be granted, because he is entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Although qualified immunity is an affirmative defense, "the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). The courts utilize a two-step analysis to determine whether officials are entitled to qualified immunity for a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 227 (2009); *see also Collier*, 569 F.3d at 217. The United States Supreme Court has recognized that the lower courts

have the discretion to decide which prong to address first, "in light of the circumstances of the particular case at hand." *Pearson*, 129 S. Ct. at 818; *Collier*, 569 F.3d at 217.

In one step, the courts will determine whether the plaintiff has alleged a violation of a constitutional right and, in the other step, whether the officers' conduct was objectively reasonable in light of clearly established law at the time the challenged conduct occurred. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). In determining this, the courts will apply an objective standard, "based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). For a right to be "clearly established," "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Kinney v. Weaver*, 367 F.3d 337, 349-50 (5th Cir. 2004) (quoting *Anderson*, 483 U.S. at 640); *Wernecke v. Garcia*, 591 F.3d 386 (5th Cir. 2009). "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Id*. at 350 (quoting *Anderson*, 483 U.S. at 640). "[W]hat 'clearly established' means . . . depends largely 'upon the level of generality at which the relevant 'legal rule' is to be identified.'" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Anderson*, 483 U.S. at 639).

"[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." *Kinney*, 367 F.3d at 350. Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id*. (quoting *Saucier*, 533 U.S. at 206). The

Court's focus, for purposes of the "clearly established" analysis, qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002). Officials who act reasonably but mistakenly are still entitled to the defense. Qualified immunity gives ample room for mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. *Anderson*, 483 U.S. at 641; *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986); *Hare*, 135 F.3d at 325. The court can determine as a matter of law whether a  defendant is entitled to qualified immunity and, specifically, whether a defendant's conduct was objectively reasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998); *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997).

### C.     Review for Frivolousness

Dr. Laravia also suggests that Rixner's complaint can be alternatively dismissed as frivolous under 28 U.S.C. § 1915 *et seq.* based on the evidence attached to this motion for summary judgment. The referenced statutory provision by its very terms authorizes the Court to *sua sponte* dismiss a case filed by a prisoner proceeding *in forma pauperis* upon a determination that the complaint or any claim therein is frivolous or malicious, the fails to state a claim for which relief can be granted, or the seeks monetary relief against an immune defendant. *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994); *see Jackson v. Vannoy*, 49 F.3d 175, 176-77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992). The Court conducted its initial screening over six months ago after the filing and after the *Spears* Hearing and has already determined that the complaint was not frivolous.

Furthermore, prior to the passage of the Prison Litigation Reform Act ("PLRA") in 1996, the Fifth Circuit did provide that "[a] court may base a dismissal under 28 U.S.C. § 1915(e) 'on medical or other prison records if they are adequately identified and authenticated.'" *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995). The Court had no such documents before it when the review for frivolousness was conducted over six months ago. Furthermore, after the PLRA, the Fifth Circuit indicated that is "impermissible" for the Court to consider outside documentation to refute a plaintiff's *Spears* Hearing testimony. *Accord Green v. Hendrick Medical Center*, 251 F.3d 157, 2001 WL 300844, at *5 (5th Cir. 2001) (Table, Text in Westlaw) (citing *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (a defendant may not use medical records to defeat a prisoner's testimony at a *Spears* hearing)).

Based on the record at that time of the review for frivolousness, the Court concluded that the complaint on its face was sufficient at least to state a § 1983 claim for inadequate medical care. "[I]f a prisoner's version of the facts underpinning a civil rights action . . . is inherently plausible and internally consistent" a court may not dismiss the claim under § 1915(e) because it is unlikely to succeed on the merits or because defendants later present conflicting facts or evidence. *Accord Green*, 2001 WL 300844, at *5 (quoting *Wesson v. Oglesby*, 910 F.2d 278, 282 (5th Cir. 1990)). "[T]o determine whether a suit is frivolous, 'a court must ask whether 'the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful.'" *Stover v. Hattiesburg Public Sch. Dist.*, 549 F.3d 985, 997-98 (5th Cir. 2008).

Dr. Laravia's request for dismissal as frivolous at this stage of the proceedings is unfounded. The motion for summary judgment and evidence attached thereto will be considered under the appropriate standards of Fed. R. Civ. P. 56 recited above.

## IV.   Analysis

### A.   Eighth Amendment Claim of Inadequate Medical Care

The standard of care owed a prisoner is clearly established by the Supreme Court.[10] Deliberate indifference by prison personnel to a prisoner's serious medical needs is actionable under § 1983 pursuant to the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006); *Lewis v. Evans*, 440 Fed. Appx. 263, 264 (5th Cir. 2011). A prison official is deliberately indifferent if he or she has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (the standard of deliberate indifference requires actual knowledge and disregard of a substantial risk of serious injury); *Washington v. La Porte County Sheriff' Dep't*, 306 F.3d 515 (7th Cir. 2002) (same).

Under *Estelle*, deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary wanton infliction of pain," proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104. This is true where the indifference is manifested by prison officials or prison healthcare providers in their response to the prisoner's needs. It is also true where the indifference is

---

[10]Were the Court to find it necessary to reach Dr. Laravia's alternative argument of qualified immunity, the first prong would be answered in that the law is clearly established on this issue. The remainder of the Court's analysis on the substance of the Eighth Amendment claim goes to the second prong of a qualified immunity test. Since no constitutional violation can be found, it is not necessary to separately consider qualified immunity.

manifested by prison officials or prison doctors and healthcare providers in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)).

In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. *Id.* Further, disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Therefore, inadequate medical treatment of inmates, at a certain point, may rise to the level of a constitutional violation, while malpractice or negligent care does not. *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza*, 989 F.2d at 193 ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action."); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or *failing to supply* medical treatment would not support an action under Section 1983." (emphasis added)); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).

**B.      Claims Against Dr. Laravia**

Rixner has alleged that he was on certain medication when he arrived at RCC, and without objective reason, Dr. Laravia discontinued some of his medication, including his statin agent. As a result, his triglyceride levels were later reported as high, endangering his already compromised liver and exposing him to potential heart issues. He also alleges that, when the infectious disease

specialist, Dr. Campbell, ordered him back on a statin agent, the medication was not provided to him at RCC. He instead periodically received inappropriate medication, such as Tylenol and Pepto Bismol, to address his nausea and other side effects caused by his anti-retroviral medications for his HIV.

The records reflect that Rixner arrived at RCC on May 5, 2011, with prescriptions from EHCC for the following medications:[11] Abacavir/Lamivudine (a/k/a Epzicom),[12] Ritonavir (a/k/a Norvir),[13] Tenofovir (a/k/a Viread),[14] Atazanavir Sulfate (a/k/a Reyataz),[15] a multivitamin, Promethazine[16] (for Phenergan), Diphenhydramine[17] (for Benadryl), Clotrimazole (a/k/a Lotrimin),[18] Gemfibrozil (for Lopid),[19] Leveteiracetam (a/k/a Keppra).[20]

---

[11]Rec. Doc. No. 23-3, Medical Record Transfer Summary (EHCC to RCC) (2 pages), 5/5/11; Intra-Institutional Health Screening, 5/5/11.

[12]Epzicom is a combination of abacavir sulfate and lamivudine used to treat HIV-1 infection. *PDR*, p. 2938.

[13]Norvir is an HIV protease inhibitor used with other medication to treat HIV-1 infection. *PDR*, p. 527.

[14]Viread is an HIV is used with other medication to treat HIV-1 infection. *PDR*, p. 988.

[15]Reyataz is an HIV protease inhibitor used with other medication to treat HIV-1 infection. *PDR*, p. 829.

[16]Generic for Phenergan. *See* fn. 6.

[17]Generic for Benadryl. *PDR*, p. 1663.

[18]Used to treat athlete's foot and infection. *PDR*, p. 118.

[19]*See* fn. 3.

[20]*See* fn. 4.

Upon his arrival, he underwent a general health screening by L. Buckley, LPN.[21]  A problem list was generated showing that he suffered with HIV+, hepatitis C, hyperlipidemia, right leg shortening, and an old tendon injury in his right hand.[22]

On May 10, 2011, after seeing Dr. Laravia, he was assigned a regular work duty status with some restrictions, including inside the compound fence, no prolonged standing and a bottom bunk.[23] Rixner consented that day to be seen by the infectious disease clinic at the LSU hospital.[24]

On May 16, 2011, Rixner submitted a health care request form complaining of leg pain and that he had not received medication for pain, his rash, or for his cholesterol.[25]  His chart was sent to the doctor by M.J. Johnson, RN.  On May 17, 2011, the doctor ordered Tylenol and Elavil.[26]  The notations also direct the staff to await lab results before starting a lipid agent.  That same day, Rixner refused to take the Tylenol provided him for pain because of his hepatitis C, and he refused the Elavil because it increased his sedation.[27]  Both medications were discontinued at his request.[28]

The record reflects that Rixner underwent a hepatitis screening at the direction of Dr. Laravia on May 25, 2011.[29]  Laboratory results dated June 3, 2011, show that Rixner's cholesterol was

---

[21]Rec. Doc. No. 23-3, Intra-Institutional Health Screening, 5/5/11.

[22]Rec. Doc. No. 23-3, RCC Problem List, 5/5/11.

[23]Rec. Doc. No. 23-3, New Intake Physical Exam, signed by Dr. Laravia 5/10/11; RCC Current Duty/Recreational Status, 5/10/11; *see also*, HIV/AIDS Confidential Reporting Worksheet, 5/10/11.

[24]Rec. Doc. No. 23-3, Acknowledgment and Consent Off-site Specialty Referral, 5/10/11.

[25]Rec. Doc. No. 23-3, Health Care Request Form, 5/16/11.

[26]*Id*.  Elavil is a former brand name for amitriptyline HCl used to treat depression.  *PDR*, p. 117.

[27]Rec. Doc. No. 23-3, 5/17/11.

[28]*Id*.

[29]Rec. Doc. No. 23-3, Hepatitis Clinic Screening, 5/25/11.

within normal limits at 160 mg/dL and his triglycerides were high at 315 mg/dL.[30]  On June 16, 2011, Dr. Laravia reviewed the report and did not order new medication.[31]  He instead ordered that the lab work be repeated in three months and the lipid levels checked in one year.  He also directed Rixner to increase walking, increase water intake, avoid smoking, avoid caffeine and decrease starches in his diet.

In connection with his chronic care lab work, his liver enzyme levels were reported as normal on June 13, 2011.[32]  The chronic care clinic notes indicate that he was to repeat the lab work in September of 2011 with a follow-up examination in October of 2011.  He was scheduled to see Dr. Campbell at the infectious disease clinic on June 30, 2011.[33]  He was to be placed on Zocor[34] after lab work, which he previously had taken.  The nurse also noted his complaints of nausea from the HIV medication and his complaints of leg pain.

On June 21, 2011, Rixner completed a sick call request complaining of leg and stomach pain and headaches.[35]  He also complained that he was having trouble breathing as a result of his allergies.  He asked for his Benadryl to be renewed and that he be given cholesterol medication for his high triglycerides.  He was examined that day by L. Young, LPN.  She recommended that he be

---

[30]Rec. Doc. No. 23-3, LabCorp Report (3 pages), 6/3/11.

[31]*Id.*, at p.3.

[32]Rec. Doc. No. 23-3, Hepatitis Clinic Screening, 5/25/11 (notation dated 6/13/11).

[33]Rec. Doc. No. 23-3, Chronic Clinic, 6/13/11.

[34]Zocor is a brand name for simvastatin used for coronary artery disease, hypercholesterolemia, hyperlipidemia, hypertriglyceridemia, and to reduce risk of myocardial infarction, revascularization, and stroke.

[35]Rec. Doc. No. 23-3, Health Care Request Form, 6/21/11.

placed on Norvasc and Ibuprofen.  She also scheduled him for weekly blood pressure checks for three weeks, she gave him celestone, and instructed him to increase water and avoid salt.[36]

On June 30, 2011, Rixner was seen at the Bogalusa Medical Center's infectious disease clinic for management of his HIV medication and lab studies.[37]  The evaluation and treatment notes prepared by Vera Williams, APRN,[38] (not Dr. Campbell) also indicate that Rixner continue his current HIV medications and that he "need[s] statin per PCP (may use statin per your formulary)."[39]  At that visit, Nurse Williams prescribed refills for four of Rixner's HIV medications: Viread, Epzicom, Reyataz, and Norvir.[40]

Upon his return to RCC, B. Cooper, RN noted that these medications were ordered to be refilled.[41]  She also apparently recognized that the nurse at BMC indicated that a statin should be added, but the medication name was left blank.  She further noted the additional lab work to be done in three months and that follow-up visits were to be maintained.

On August 8, 2011, Rixner was seen for complaints of nausea, vomiting and leg pain.[42]  The examining nurse, L. Buckley, LPN, noted that he had recent, prior sick call complaints about his leg

---

[36]*See also*, Rec. Doc. No. 23-3, Health Care Information, 7/11/11 (L. Buckley, LPN); *see also*, Rec. Doc. No. 23-3, Letter to Dr. Laravia, 8/15/11; Health Care Information, 6/27/11 (week one blood pressure check 132/83); Health Care Information, 7/4/11 (week two blood pressure check 119/77); Health Care Information, 7/11/11 (week three blood pressure check 123/79).

[37]Rec. Doc. No. 23-3, BMC Outpatient Clinic Visit Record Physician/Provider Notes, 6/30/11 (signed by Vera Williams, APRN); Offender Collaborative Care Communication Form, Summary of Care and Recommendations, 6/30/11 (signed by Vera Williams, APRN).

[38]Advanced practice registered nurse.

[39]*Id*.

[40]Rec. Doc. No. 23-3, Bogalusa Medical Center Prescriptions (2 pages), 6/30/11.

[41]Rec. Doc. No. 23-3, Emergency Room, 6/30/11.

[42]Rec. Doc. No. 23-3, Health Care Request Form, 8/8/11.

pain.  She reported that he had one episode of vomiting the night before and two occurrences of loose stools.  She also noted that he was already provided Motrin (Ibuprofen) for the leg pain as needed.  She gave him Pepto Bismol for the non-emergency intestinal issues.  He was told to increase his water intake and make routine sick call.

On August 15, 2011, an unidentified infection control nurse wrote a letter to Dr. Laravia to summarize Rixner's care at RCC.[43]  She reported a summary of the care and treatment he received while at RCC similar to that already summarized herein.

At the follow-up chronic care visit on October 10, 2011, he asked to have his medication moved to the lunch time pill call to ease the nausea.  Additional lab work was ordered to check his lipids and HIV reports.[44]

The RCC medication profiles indicate that, on May 10, 2011, he was prescribed Epzicom, Norvir, Viread, Reyataz, and a Multivitamin.[45]  He also was prescribed Benadryl for one month from May 10, 2011 to June 10, 2011.  On June 27, 2011, he was prescribed Norvasc until May 10, 2012.  He also later received extended prescriptions on July 11, 2011, for Epzicom, Viread, Reyataz, and Norvir to run until July of 2012.  An Omega 3 fish oil tablet was added to his regimen on August 16, 2011.[46]  This was discontinued on September 8, 2011 on the order of Dr. Singh, the Department

---

[43]Rec. Doc. No. 23-3, Letter to Dr. Laravia, 8/15/11.

[44]Rec. Doc. No. 23-3, Chronic Clinic, 10/10/11.

[45]Rec. Doc. No. 23-3, RCC Medication Profile, May 10, 2011-November 16, 2011.

[46]Rec. Doc. No. 23-3, RCC Medication Profile, May 10, 2011-November 16, 2011; Health Care Information, 11/16/11.

of Corrections Medical Director.[47]   A prescription for Mobic[48] was added for his leg pain on

November 16, 2011 just prior to his transfer to DWCC.[49]

The medical administration records indicate that he was provided with all of the medication

prescribed above as ordered.  The May 2011 records indicate that Rixner was prescribed and

provided at RCC with Abacavir/Lamivudine (Epzicom), Ritonavir (Norvir), Tenofovir Disoproxil

(Viread), Atazanavir (Reyataz), and a multivitamin, unless it was not requested or refused by

Rixner.[50]

The medical administration records for June, July, August of 2011 indicate that he received

Norvasc, Motrin (as needed), Abacavir/Lamivudine, Ritonavir, Tenofovir, Atazanavir Sulfate, a

multivitamin, each as daily prescribed unless not requested by Rixner.[51]  He was offered but never

requested Diphenhydramine (Benadryl) in June.[52]  Fish oil was also provided to him beginning in

mid-August and later discontinued as noted above.[53]

The medical administration records further reflect that, during November 2011, Rixner

received Viread (Tenofovir Disoproxil), Reyataz (Atazanavir), Norvir (Ritonavir), Epzicom

(Abacavir/Lamivudine), and a multivitamin every day, unless not requested, until his transfer to

---

[47]Rec. Doc. No. 23-3, Health Care Information, 9/8/11.

[48]Mobic is a brand name for meloxicam, used to treat osteoarthritis and rheumatoid arthritis. *PDR*, at 123.

[49]Rec. Doc. No. 23-3, RCC Medication Profile, May 10, 2011-November 16, 2011.

[50]Rec. Doc. No. 23-3, Medication Administration Record, May 2011.

[51]Rec. Doc. No. 23-3, Medication Administration Record (3 pages), June 2011; Medication Administration Record, July 2011; Medication Administration Record (2 pages), August 2011.

[52]Rec. Doc. No. 23-3, Medication Administration Record (3 pages), June 2011.

[53]Rec. Doc. No. 23-3, Medication Administration Record (2 pages), August 2011.

DWCC.[54]  When Rixner left RCC for DWCC on November 18, 2011, his record summary showed diagnoses of HIV+, hepatitis C, and hyperlipidemia.[55]  His record also showed his history of an old tendon injury to the right hand and his right leg shorter than the left leg.  He also had prescriptions for the multivitamin, Norvasc, Epzicom, Viread, Reyataz, Norvir, and Mobic.

A review of the records from RCC indicate that each of Rixner's requests for medical care was timely responded to and addressed by the medical staff, including Dr. Laravia.  The focus of Rixner's complaint before this Court is Dr. Laravia's decision to not place him on a statin in spite of his elevated triglyceride levels in June of 2011, and the provisions for analgesic, like Tylenol, instead of regular pain medication.

A review of the medication list provided by EHCC  indicates that a few weeks before he was transferred to RCC, he was placed on a statin, Gemfibrozil (Lopid).  That medication, along with a few others, were not continued or reordered by Dr. Laravia after the May 10, 2011 examination of Rixner and review of his medical records.  Contrary to Rixner's claims, the competent summary judgment evidence indicates that he was seen by Dr. Laravia, and that Dr. Laravia did review his incoming records.  As later noted by Dr. Laravia, and as recognized by Rixner, the doctor chose to await the lab results before addressing the need for a statin.

When the results returned with normal cholesterol and elevated triglyceride counts, Dr. Laravia reviewed the report and ordered changes in Rixner's lifestyle and diet rather than medication.[56]  In addition, the medical staff provided or made available to Rixner occasional doses

---

[54]Rec. Doc. No. 23-3, Medication Administration Record (2 pages), November 2011.

[55]Rec. Doc. No. 23-3, Medical Record Transfer Summary (RCC to DWCC), 11/18/11; Intra-Institutional Health Screening (DWCC), 11/21/11.

[56]Rec. Doc. No. 23-3, LabCorp Report (3 pages), 6/3/11.

of Tylenol and Ibuprofen as needed for his leg pain and discomfort.  Dr. Laravia states in his unrefuted affidavit that these small doses would not impact Rixner's liver.[57]

Rixner disagrees with these courses of treatment and argues that Dr. Laravia should have prescribed him the medication he was used to taking.  Rixner is correct in that the medical records indicate that he was on a statin drug when he arrived at RCC.  The record also indicates that Dr. Laravia did not prescribe a statin for Rixner after the lab results were returned or at anytime before he left.  However, in light of the abundance of medical care and medication provided to Rixner, it cannot be said that the failure to prescribe that medication amounted to an intentional indifference.

At best, the doctor's decision might be considered error or negligence, which is not actionable under § 1983.  Furthermore, a doctor's decision whether to provide additional treatment and as to which medications to prescribe is a matter for medical judgment.  *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  The decision whether to prescribe a particular medication "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.  Mere error in the exercise of that medical judgment would not be sufficient to state an Eighth Amendment claim of intentional indifference. *See Samma v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012).

Instead, in order to prevail, Rixner must establish that Dr. Laravia "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at 346 (quoting *Domino v. Tex. Dept. of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).  This is not the circumstance shown by the undisputed medical records in this case.

---

[57]Rec. Doc. No. 23-1, p. 3, Affidavit.

The records instead indicate that Dr. Laravia and the RCC medical staff did attend to Rixner's medical claims.  Dr. Laravia reviewed and assessed Rixner's blood work, which indicated that Rixner's cholesterol was within normal limits even though the triglycerides were elevated.  Rixner has not suffered any ill-effects from the treatment provided at RCC.  He disagrees with it and suggests that it could have exposed him to the potential for more serious consequences.  However, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.  *Farmer*, 511 U.S. at 838.

Rixner also points to the fact that another medical care provider indicated his need to be on a statin, which was ignored by Dr. Laravia.  Contrary to his suggestions, the records do not indicate that he was actually examined by Dr. Walter Campbell at the infectious disease clinic.  Instead, the clinic and treatment notes and prescriptions from that clinic were completed and signed by an advanced practice registered nurse on Dr. Campbell's staff, although Dr. Laravia indicates he did at some point consult with Dr. Campbell.  According to the medical records, it was the nurse who suggested the need for a statin drug.  In either case, there is no Eighth Amendment requirement that Dr. Laravia concur with another doctor's diagnosis or carry out the recommendation or instructions of another doctor.  *Accord Spry v. Chapman*, No. 08CV459, 2011 WL 1807858, at *7 (N.D. Tex. May 12, 2011) (citing *Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999)).  If a doctor is not constitutionally required to follow the recommendations of another doctor, *a fortiori*, a doctor would not be required to comply with directives of a nurse.

In sum, Rixner's disagreement with Dr. Laravia's course of treatment, which required Rixner to change his diet and activities rather than take statin medication to lower his triglycerides does not establish a constitutional violation.  *See Cano v. Caskey*, 425 Fed. Appx. 381, 382 (5th Cir. 2011).

Furthermore, to the extent Rixner believes that Dr. Laravia's treatment was in error, it is well settled that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

The record does not demonstrate an intentional indifference by Dr. Laravia by this treatment, or the other care provided to Rixner, sufficient to establish that a constitutional violation occurred. In addition, nothing in Rixner's self-serving affidavit factually disputes the medical records or refutes the conclusion that Dr. Laravia is entitled to judgment as a matter of law.

In addition, under a broad reading, Rixner has arguably asserted state law claims of negligence or malpractice arising from Dr. Laravia's treatment decisions. The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over these claims.

The "general rule" in the Fifth Circuit "is to decline to exercise jurisdiction over pendent state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial." *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999) (citation omitted); *accord Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims"). Under § 1367(c), a district court may decline to exercise supplemental jurisdiction if (1) a claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *See Joseph v. Nelson Coleman Corr. Ctr.*, No. 09-7562, 2010 WL 5058195, at *16 (E.D. La. Nov. 30, 2010). For the

reasons set forth herein, the Court has found that Dr. Laravia is entitled to judgment as a matter of law under § 1983 and the federal claims against him will be dismissed.  Any claims of negligence treatment or malpractice are best left to the state courts.  Thus, pursuant to §1367(c)(3), to the extent Rixner has raised state law claims, these claims should be dismissed without prejudice as the Court declines to exercise its supplemental jurisdiction.  *Accord*, *Brim v. ExxonMobile Pipeline Co.*, 213 Fed. Appx. 303, 305 (5th Cir. 2007) ("In this instance, § 1367(c)(3) clearly applies because the district court dismissed [plaintiffs'] federal statutory claims on summary judgment.").  Accordingly,

      **IT IS ORDERED** that Dr. Laravia's **Motion for Summary Judgment (Rec. Doc. No. 23)** is **GRANTED** and Rixner's 42 U.S.C. § 1983 claims of constitutionally inadequate medical care against Dr. Laravia are **DISMISSED WITH PREJUDICE**.

      **IT IS FURTHER ORDERED** that Rixner's state law claims against Dr. Laravia are **DISMISSED WITHOUT PREJUDICE**, because the Court declines to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(c).

      New Orleans, Louisiana, this 18th day of May, 2012.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**